1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  PETTERS COMPANY INC.,                    No. C 04-02160 CRB

12          Plaintiff,                        **MEMORANDUM RE: MOTIONS FOR
                                              SUMMARY JUDGMENT**
13      v.

14  BLS SALES INC., et al.,

15          Defendants.
    _____/

16

17          In this diversity action the parties dispute where liability should fall after the failure of

18  a complex series of commercial transactions.  The parties previously filed various motions

19  for summary judgment in which they sought to discern remaining disputes of fact regarding

20  one set of transactions that involved designer handbags.  After the hearing on the motions,

21  the Court issued an order containing only its rulings.  In this memorandum, the Court

22  elaborates on those rulings.

23                              **BACKGROUND**

24          Although there are several transactions at issue in these motions, all share the same

25  basic structure.  The transaction began with discussions between National Clothing Co., a

26  subsidiary of Costco Wholesale Corporation ("Costco"), and Barry Smith of BLS Sales Inc.

27  (collectively "BLS") regarding Costco's need for certain goods.  Costco then issued purchase

28  orders to BLS for the goods.  Next, BLS contacted Helen Dang and/or Tuan Tran who in turn

**United States District Court**

For the Northern District of California

**United States District Court**

For the Northern District of California

would locate a supplier of the goods.  BLS would also contact Petters Company, Inc. ("Petters") in order to secure financing for the deal.  After Petters agreed to provide financing, Costco cancelled the purchase orders issued to BLS and reissued them to Petters. Costco and Petters would also sign other agreements which designated Petters as the "vendor" of the goods.  Under this arrangement, Petters would pay the suppliers, who would ship the goods directly to Costco.  Costco would then send payments to Petters.  After collecting the money and reimbursing itself, Petters sent the profit from the transaction, if any, to BLS.  The parties refer to this scheme as "purchase order financing."  Critically, in all of the transactions there was never any formal written contract between Petters and BLS when the transaction was initiated.

Three separate transactions are involved in the present motions and are described below.

**I.  The 2002 Fendi Transaction**

In 2002, Costco contacted BLS regarding its interest in obtaining high-end handbags. Petters contacted Dang, who in turn was able to find Fendi and Prada bags that were available for sale.  Following the structure outlined above, the bags were shipped to Costco. As a part of the deal Petters wired approximately $3,640,000 to BLS.  Only $3,037,961 of this sum was paid by Costco to Petters, leaving a balance of $602,039.

Petters claims it had several discussions with BLS regarding the unpaid balance, eventually resulting in a June 2003 oral agreement between Barry Smith of BLS and Deanna Munson of Petters for an installment repayment plan.  Petters states that this plan was executed through the $1.3 million promissory note described below.

**II.  The 2003 Burberry Transaction**

In summer 2003, a similar deal for high-end handbags--this time Burberry, Christian Dior and Prada--was executed.  Petters made transfers to BLS totaling $968,360.  Costco never made any payment on this amount.

/ / /

/ / /

2

**United States District Court**

For the Northern District of California

### III.  The 2003 Coach Transaction and Promissory Notes

In October 2003, a third transaction was arranged, this time for Coach goods.  This deal was substantially larger than the previous ones, with a value of approximately $16 million.  Petters was required to pay to the supplier, Global Win (Asia) Limited ("Global Win"), 15% of the total transaction cost before November 13, 2003 and provide a letter of credit to Global Win for the remaining $14 million.

By November 2003, Costco still had not paid the balances due on the 2002 Fendi and 2003 Burberry transactions.  Petters refused to provide financing for the 2003 Coach transactions unless Smith and BLS agreed to sign promissory notes and guarantees covering that debt.[1]  Smith and BLS agreed to sign the notes and guarantees, but also asked that Tran and his company Capri, Inc. ("Capri") also sign.  Accordingly, Smith, BLS, Tran and Capri executed two promissory notes and two guarantee agreements to Petters.  The promissory notes were in the amounts of $1,257,239 and $968,360.  These amounts correspond with the unpaid amounts on the 2002 Fendi and 2003 Burberry transactions: $602,039 for the unpaid balance from the Fendi transaction plus $655,200 in interest;[2] and for the Burberry transaction $968,360 unpaid with no interest.  Having received these notes, Petters wired $2,224,520.83 to Global Win.

On January 20, 2004, Costco cancelled the Coach transaction.  Petters responded by refusing to send the letter of credit that was due on January 31, 2004.  Global Win did not return the $2.2 million to Petters, claiming that it was a forfeited deposit.

At some time during the dispute it was discovered that the handbags at the heart of the transactions were counterfeit.

Petters filed this action on June 1, 2004 against BLS.  BLS filed a crossclaim against Costco and Petters on June 23, 2004.  Capri, Tran and Dang filed crossclaims against BLS

---

[1]There is a dispute among the parties regarding whether the promissory notes and guarantees simply memorialized BLS's prior debt to Petters or created a new debt.

[2]Interest was calculated at a rate of 3% per month.

3

United States District Court

For the Northern District of California

1    and Smith on June 24, 2004.  BLS also filed a crosscomplaint against Capri, Dang, and Tran

2    on July 15, 2004.

3         Several parties have moved for summary judgment.  Each motion is examined

4    separately below.

5    **I.  Summary Judgment Standard**

6         A principle purpose of the summary judgment procedure is to isolate and dispose of

7    factually unsupported claims.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  A

8    party moving for summary judgment that does not have the ultimate burden of persuasion at

9    trial (usually the defendant) has the initial burden of producing evidence negating an

10   essential element of the non-moving party's claims *or* showing that the non-moving party

11   does not have enough evidence of an essential element to carry its ultimate burden of

12   persuasion at trial.  See Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102

13   (9th Cir. 2000).

14        If the moving party does not satisfy its initial burden, the non-moving party has no

15   obligation to produce anything and summary judgment must be denied.  If, on the other hand,

16   the moving party has satisfied its initial burden of production, then the non-moving party

17   may not rest upon mere allegations or denials of the adverse party's evidence, but instead

18   must produce admissible evidence that shows there is a genuine issue of material fact for

19   trial.  See Nissan Fire & Marine Ins. Co., 210 F.3d at 1102.  A genuine issue of fact is one

20   that could reasonably be resolved in favor of either party.  A dispute is "material" only if it

21   could affect the outcome of the suit under the governing law.  See Anderson v. Liberty

22   Lobby, Inc., 477 U.S. 242, 248-49 (1986).

23   **II.  Defendants Smith and BLS's Motion for Partial Summary Judgment**

24        BLS moves for summary judgment on Petters' four causes of action for breach of the

25   promissory notes and guarantees, arguing: (1) there was no consideration; (2) the contracts

26   concerned counterfeit goods and are therefore void for illegality; and (3) the 3% per month

27   interest rate charged was usurious.  Second, BLS also moves for summary judgment on

28   Petters' breach of contract claim based on the nonrepayment of the $2.2 million wired to

4

United States District Court

For the Northern District of California

1 Global Win in the Coach transaction; they argue that there is no factual support for the

2 assertion that this was a loan to BLS.  Third, BLS moves for summary judgment on Petters'

3 unjust enrichment claim, also based on the $2.2 million wired to Global Win; they argue that

4 an unjust enrichment claim cannot be sustained absent evidence that BLS received a benefit.

5 **A.  Promissory Notes and Guarantees**

6 A preliminary issue with respect to the promissory notes is choice-of-law.  The

7 promissory notes and the guaranties both contain clauses providing that they shall be

8 governed by Minnesota law.  Because this is a diversity case, California's choice-of-law

9 rules apply.  See Shannon-Vail Five Inc. v. Bunch, 270 F.3d 1207, 1210 (9th Cir. 2001).

10 California generally follows the approach of the Second Restatement of Conflict of Laws

11 which allows enforcement of a contractual choice-of-law clause where (1) the chosen state

12 bears a substantial relationship to the parties or the contract, or there is some other reasonable

13 basis for the parties' choice; and (2) application of the chosen state's law does not violate

14 fundamental California public policy.  See Nedlloyd Lines B.V. v. Superior Court of San

15 Matero County, 3 Cal.4th 459, 464-65 (Cal. 1992).  Here, Petters is located in Minnesota,

16 therefore the substantial relationship prong is met.  Except with regard to the issue of usury,

17 there is no dispute that the application of Minnesota law does not violate California's strong

18 public policy.  Whether the interest rates charged by the notes violates California policy is

19 discussed below.

20 **(1) Lack of Consideration**

21 BLS argues that the promissory notes did not constitute valid, binding contracts

22 because they were executed without consideration.  See Chalmers v. Kanawyer, 544 N.W.2d

23 795, 798 (Minn. App. 1996) (When there is a lack of consideration, no valid contract is ever

24 formed.).  They claim that the amounts they owed to Petters from the 2002 Fendi transaction

25 and the 2003 Burberry transaction was due under prior agreements, and therefore the

26 promissory notes executed in November 2003 were not supported by any independent

27 consideration from Petters.

28 / / /

5

**United States District Court**

For the Northern District of California

1    The promissory notes were supported by consideration from both parties.  All parties

2    agree that Petters would not finance the 2003 Coach transaction unless BLS agreed to sign

3    the two promissory notes covering Costco's unpaid debt.  Therefore, BLS received value for

4    executing the promissory notes in the form of Petters' provision of financing for the 2003

5    Coach transaction.  In return, Petters received the value of BLS assuming responsibility for a

6    debt they may not have been previously obligated to pay.  The Court need not determine

7    whether the values exchanged were of a comparable magnitude, since courts "will not

8    examine the adequacy of consideration so long as something of value has passed between the

9    parties."  Powell v. MVE Holdings, Inc., 626 N.W.2d 451, 463 (Minn. Ct. App. 2001).

10    Therefore, BLS's argument that there was no consideration fails.

11    **(2) Illegality**

12    BLS claims that the promissory notes are invalid because the bags sold in the Fendi

13    and Burberry transactions were illegal counterfeit marks as defined by federal trademark law.

14    Under Minnesota law,[3] in order to render a contract unenforceable because of

15    illegality the defendant must both have knowledge of the vendor's unlawful intent and have

16    actively participated in the unlawful design.  See Anheuser-Busch Brewing Ass'n v. Mason,

17    44 Minn. 318, 320 (Minn. 1890).  A contract is not void simply because there is something

18    immoral or illegal in its surroundings or because it tends to promote an illegal purpose.  Id.

19    Here, BLS claims that Petters knew that the bags were fakes because it paid a 15%

20    deposit for the "manufacture" of the Coach bags.  Under BLS's logic, because Petters knew

21    that Costco was interested in acquiring grey-market goods,[4] the fact that Petters paid a

22    deposit for manufacturing costs demonstrates it knew that the bags were not authentic.

23    Petters denies knowledge that the bags were counterfeit and points out that BLS has not

24    ///

---

26    [3]BLS argues that California law applies to this issue.  However, as noted above, the contractual
27    choice-of-law provision is effective and therefore Minnesota law applies.

28    [4]According to BLS, "grey-market goods" are merchandise acquired from vendors other
than the manufacturer in order to obtain goods the manufacturer refuses to sell directly to
Costco.

United States District Court

For the Northern District of California

1    produced any direct evidence of such knowledge.  Because there is a dispute of fact as to

2    whether such knowledge exists, summary judgment on these grounds is inappropriate.

3              **(3) Usury**

4        BLS argues that the promissory notes are void because they charge a usurious 3% per

5    month rate of interest.[5]  California's Constitution provides that business loans charging an

6    excess of 10% interest per year are usurious.  In contrast, while Minnesota law also limits

7    interest rates of certain contracts, the state does not allow corporations to assert the defense

8    of usury.  Dahmes v. Industrial Credit Co., 261 Minn. 26, 31 (Minn. 1961); Minn. Stat. §

9    334.022.  BLS argues that Minnesota law does not apply because the contractual interest rate

10   violates fundamental California public policy.  See Nedlloyd Lines B.V. v. Superior Court of

11   San Matero County, 3 Cal.4th 459, 464-65 (Cal. 1992) (Contractual choice-of-law clause not

12   honored where doing so would violate strong California public policy).

13       California courts have had the opportunity to determine whether California's

14   prohibition on usury is fundamental public policy overriding a contractual choice-of-law

15   provision.  While they have never settled on a particular standard, they have allowed interest

16   rates above the constitutional limit where there is a substantial relationship between the

17   contract and the state which is referenced in the choice-of-law provision.

18       In Ury v. Jewelers Acceptance Corp., 227 Cal.App.2d 11 (Cal. Ct. App. 1964), the

19   court expressed doubt that California had a strong public policy with respect to usury, since

20   the state's constitutional usury provision contains exceptions for banks, loan associations,

21   licensed pawnbrokers and myriad other entities.  Id. at 20.  The court limited its ruling,

22   however, to the contract before it, finding no strong public policy against a 20.3% interest

23   rate on a commercial loan.

24

25

26       [5]  Both parties appear to agree that the promissory notes charge an annual rate of interest
     of 36% (i.e. 3% x 12).  However, the promissory notes call for "a rate of interest equal to 3.0%
27   per month, based on the actual number of days elapsed and a 30-day month."  This Court does
     not decide here what kind of compounding this clause provides for.  The Court finds that, no
28   matter what compounding method is used, the actual annual rate is not so high as to offend
     strong California public policy, given the contract's substantial relationship to Minnesota.

**United States District Court**

For the Northern District of California

In <u>Gamer v. duPont Glore Forgan, Inc.</u>, 65 Cal.App.3d 280 (Cal. Ct. App. 1976), the court found that although California's usury law represents strong public policy, the contract's choice of New York law was not invalid because the prime rate of interest at the time was 9% and New York allowed a rate only up to 12.25%. <u>Id.</u> at 287-90. The court also found it important that the contract had a substantial relationship to New York. <u>Id.</u> at 290.

In <u>Sarlot-Kantajarian v. First Pennsylvania Mortgage Trust</u>, 599 F.2d 915 (9th Cir. 1979), the Ninth Circuit followed <u>Ury</u> to find that a contractual choice-of-law clause selecting Massachusetts law was valid where the contractual rate was no more than 18% and where Massachusetts, as the place of contract, disbursement and repayment, had a substantial relationship to the contract. <u>Id.</u> at 917.

In <u>Mencor Enterprises v. Hets Equities Corp.</u>, 190 Cal.App.3d 432 (Cal. Ct. App. 1987), the court conducted a detailed analysis of the several provisions of the Restatement (Second) of Conflict of Laws that could affect the question of whether to apply Colorado law, which would have allowed for the 44% interest rate specified in the contract. The court concluded that the validity of the rate "depends on the relationship of Colorado to the parties and the contract . . . [the] rate will be applied only if Colorado has a relationship to the parties or the contract." <u>Id.</u> at 439. The court ultimately declined to answer this question, finding that it was inappropriate to make this determination on demurrer, and that an evidentiary hearing should be held.

Here, no evidentiary hearing is required. The question comes before this Court on a motion for summary judgment and the undisputed factual record establishes a substantial relationship between the contract and Minnesota. On their face, the promissory notes state that Petters is a Minnesota corporation and that the presumptive place of repayment is Minnesota. As such, there is a substantial enough relationship to allow the contractual interest rate. Minnesota's decision to exempt all corporations from usury restrictions is similar in purpose and effect to California's decision to exempt certain classes of financial institutions. <u>See Ury</u>, 227 Cal.App.2d at 20. That Minnesota has chosen to exempt a broader class of entities does not reflect a radical departure from California's policies. For these

8

1  reasons, this Court finds that the contractual choice-of-law clause does apply and that BLS's

2  claim of usury should be rejected.

3     **B.  The $2.2 Million "Loan"**

4        BLS also moves for summary judgment in its favor on Petters cause of action for

5  breach of contract based on the alleged $2.2 million loan from Petters to BLS for the Coach

6  transaction.  This money was wired from Petters to Global Win, and Petters claims that it was

7  a loan for which BLS is liable.

8                **(1) Sufficiency of the Evidence**

9        BLS argues that there is no evidence that such a loan existed.  Petters responds that

10  Barry Smith of BLS admitted in his deposition that the basic structure of the Coach deal, as

11  with other deals, was that Petters was engaging in "purchase-order financing" for BLS.

12        There is a dispute of material fact as to whether there was an oral or implicit

13  agreement between Petters and BLS creating a $2.2 million loan.  Smith admitted in his

14  deposition that he would tell Costco that "we've set up our financing through Petters" and

15  that it was BLS's practice to "ask Petters to finance" Costco transactions.  In addition, there

16  are documents from prior transactions showing that BLS had requested "financing" from

17  Petters.  This appears to evidence an understanding between the parties of a debtor-creditor

18  relationship between them.  BLS, as the party moving for summary judgment, bears the

19  burden of demonstrating that this is not enough to have created a contractual relationship.  As

20  BLS has failed to satisfy that burden, the motion must be denied.

21                **(2) Total Breach**

22        As discussed above, as a part of the 2003 Coach transaction Petters was to have paid

23  Global Win $2.2 million up front and then post a $14 million letter of credit for the balance

24  of the amount owed on the transaction.  However, after Costco cancelled the transaction

25  Petters failed to post the letter of credit.  BLS argues that this failure constituted a total

26  breach of contract that excuses BLS's performance.

27        "[T]otal breach plus repudation makes the defendant liable for damages and

28  discharges plaintiff's remaining remedies."  G.W. Anderson Construction v. Mars Sales, 164

United States District Court

For the Northern District of California

Cal.App.3d 326, 338 (Cal. Ct. App. 1985).[6]  In response, Petters argues that it did not breach the contract because its own obligation to post a letter of credit was discharged when Costco cancelled its order.

Because the terms, indeed the existence, of the underlying contract remain in dispute, it would be inappropriate at this stage to make a ruling regarding whether Petters did or did not commit total breach.  Therefore, summary judgment should not be granted.

**C.  Unjust Enrichment**

Petters' complaint also contains a cause of action for unjust enrichment against Smith and Dang based on the alleged $2.2 million loan.  In that cause of action, Petters alleges that Smith and Dang have been unjustly enriched by retaining the loan proceeds based on the illegitimate justification that the sum constituted a non-refundable deposit.

In order to make out a claim for unjust enrichment, the plaintiff must show that the defendant received some benefit.  See Rowell v. Crow, 93 Cal.App.2d 500, 503 (Cal. Ct. App. 1949).  Here, there is no evidence in the record that BLS or Smith ever received any benefit from the $2.2 million.  The money was wired by Petters to a Global Win account and there is no evidence that Smith ever received any commission from it.  Accordingly, Smith's motion for summary judgment on Petters' unjust enrichment claim is granted.

**III.  Plaintiff Petters' Motion for Summary Judgment**

Petters moves for summary judgment on their breach of contract claims based on the two promissory notes and the two guarantees.  Petters also moves for summary judgment on BLS's counterclaim for a commission on the Coach transaction.

**A.  Promissory Notes**

**(1) BLS and Smith**

BLS and Smith make the same arguments in defense to Petters' claims under the promissory notes as they did in their motion for summary judgment, i.e. lack of consideration, illegality and usury.  They also argue that summary judgment is precluded by

---

[6]The parties have not discussed what law governs the purported loans, and instead make arguments based on California law.  The Court therefore assumes that California law applies to the loans.

United States District Court

For the Northern District of California

1  disputes of fact regarding their defenses of duress, the amounts owed under the notes, and

2  their defense of failure to mitigate.

3                                  a.  Consideration

4        As discussed above, the Court finds that there was valid, legal consideration in

5  support of the contract.

6                                  b.  Illegality

7        As already noted, there is a dispute of fact as to whether Petters knew that the

8  transactions that it had financed were for counterfeit goods.  If they did have such

9  knowledge, and if they actively participated in the scheme, then the contracts would be void.

10  Therefore, summary judgment in Petters' favor is inappropriate.

11                                  c.  Usury

12        There is no dispute of fact regarding the issue of usury.  The only dispute relates to

13  choice of law.  As discussed above, because the contract specifies Minnesota as the place of

14  repayment, and because Petters is a Minnesota company, Minnesota's usury laws apply.

15  BLS's claim of usury therefore fails.

16                                  d.  Duress

17        According to BLS, Petters waited until the day the $2.2 million deposit was due to

18  Global Win and then threatened to not send the money unless BLS signed the notes and

19  guarantees.  BLS argues that if it had not signed the promissory notes and guarantees at that

20  time, the $16 million Coach deal would have fallen apart, reaping catastrophic harm on

21  BLS's relationship with Costco--one of its biggest clients--and driving BLS out of business.

22  Therefore, they argue, the contract is void under a theory of economic duress.

23        An important preliminary question in resolving this issue is choice of law.  If

24  Minnesota law applies, then this theory can be rejected because Minnesota does not

25  recognize economic duress.  See Bond v. Charlson, 374 N.W.2d 423, 428 (Minn. 1985)

26  (rejecting economic duress theory and stating that "[d]uress is available as a defense to a

27  contract only when agreement is coerced by physical force or unlawful threats"); St. Louis

28  Park Inv. Co. v. R.L. Johnson Inv. Co., 411 N.W.2d 288, 291 (Minn.App. 1987).  However,

United States District Court

For the Northern District of California

1  California does recognize such a theory of duress. <u>See</u> <u>Rich & Whillock, Inc. v. Ashton</u>

2  <u>Development, Inc.</u>, 157 Cal.App.3d 1154, 1158 (Cal. Ct. App. 1984).

3        Under the Restatement, which applies to this question, the choice-of-law clause in the

4  promissory notes is given effect over a claim of duress unless it is claimed that the duress

5  caused assent to the choice-of-law clause itself.  <u>See</u> Restatement (Second) of Conflict of

6  Laws § 201 Comments a & c; § 187 Comment b.  Here, a reasonable interpretation of

7  Smith's argument is that he agreed to all of the terms of the promissory note and guarantee

8  under duress and would not have assented to any of the provisions of either contract

9  (including the choice-of-law clauses) absent such duress.  Under these circumstances,

10  California law applies.

11        California recognizes economic duress where there is "a wrongful act which is

12  sufficiently coercive to cause a reasonably prudent person faced with no reasonable

13  alternative to succumb to the perpetrator's pressure."  <u>Rich & Whillock</u>, 157 Cal.App.3d at

14  1158.  Examples of "wrongful acts" include "the assertion of a claim known to be false, a

15  bad faith threat to breach a contract or a threat to withhold a payment."  <u>Id</u>.  Indeed, it may

16  even be enough for the plaintiff to have engaged in "the wrongful exploitation of business

17  exigencies to obtain disproportionate exchanges of value."  <u>Id.</u> at 1159.

18        Petters argues that there cannot be economic duress here because it committed no

19  wrongful act in demanding the memorialization of a prior debt as a condition to enter into the

20  2003 Coach deal.  However, there is a dispute of fact regarding whether BLS owed any debt

21  to Petters at all.  If BLS's version of the facts is believed, then Petters' conduct could be

22  classified as wrongful under California's broad construction of economic duress.

23        Petters also claims that BLS had a reasonable alternative in that it could have secured

24  a loan from another company.  They argue further that BLS never objected to the promissory

25  notes and had ample time to determine whether or not BLS would sign them.  The inquiry

26  into whether there was a reasonable alternative is an issue of fact, and may only be resolved

27  on summary judgment if there is no dispute of fact.  <u>See</u> <u>CrossTalk Productions, Inc. v.</u>

28  <u>Jacobson</u>, 65 Cal.App.4th 631, 644 (Cal. Ct. App. 1998).  The parties dispute whether it was

feasible for BLS to have secured alternate financing.  If BLS is right that there was no other way to secure financing and that it faced financial ruin if the Coach deal fell apart, then it had no reasonable alternative under California law.  See Rich & Whillock, 157 Cal.App.3d at 1158 (stating that financial ruin or bankruptcy is not a reasonable alternative).

Therefore issues of fact remain and summary judgment on the issue of duress is denied.

### e.  Amount Owed on the Promissory Notes

BLS argues that a dispute of fact remains regarding the precise amount owed on the promissory notes because the notes memorialized the prior debt, a portion of which Costco may have repaid and which therefore should be credited against the notes.  However, the notes on their face make no provision for this kind of set off and instead plainly require BLS and Smith to pay the amounts specified on their face.  BLS has produced no evidentiary or legal basis to ignore the plain terms of the contract.  Accordingly, if the promissory notes are valid the amount owed is a fixed sum for which BLS is liable.

### f.  Failure to Mitigate

BLS argues that Petters could have mitigated its damages by obtaining more money from Costco.  Specifically, BLS claims that Costco failed to pay the entire amount owed on the Fendi and Burberry transactions because it claimed that some goods were not shipped and some goods were damaged.  According to BLS, some of these denials were in violation of the California Commercial Code and the UCC and therefore Petters, as the "vendor" in the transaction, had a right to demand that Costco pay more than it did.  BLS further suggests that Petters may also have reduced its debt by suing Costco.

These issues go to the size of BLS's debt prior to the signature of the promissory notes.  However, a reasonable interpretation of the notes is that they set an agreed-upon fixed value on the remaining debt on the date they were signed.  As stated above, BLS has produced no evidence that the amounts due on the notes is anything other than what they provide for on their face.  BLS's failure to mitigate argument therefore fails.

/ / /

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

**_____(2)  Tran and Capri**

Tran and Capri claim that the promissory notes are invalid or otherwise unenforceable for reasons similar to those given by Smith and BLS.  However, since they played a different role in the transactions, Tran and Capri's claims require an independent analysis.

a.  Consideration

Tran and Capri argue that the promissory notes and guarantees are not enforceable against them because they did not receive any benefit from any of the transactions at issue in this case.  Unlike Smith and BLS, there is no allegation that Tran and Capri may have received a commission from the Coach transaction.  They also were not participants in the earlier Fendi and Burberry transactions.

However, there remains a material dispute of fact as to whether Tran and Capri received consideration for signing the notes and guarantees.  Petters argues that Tran and Capri received a benefit from signing the notes because they stood to gain an $800,000 profit on the 2003 Coach transaction, which Petters would not have financed unless the notes were signed.  Tran claims that he did not stand to gain financially from the transaction.  Summary judgment on this issue is therefore denied.

b.  Usury

Tran's usury argument is identical to the one made by BLS above.  However, Tran argues, based on Mencor that the substantialness of the relationship of the contract to Minnesota is an issue of fact that must be resolved at trial.  In Mencor the court declined to pass judgment on the applicability of Colorado's less restrictive usury law and instead opted to allow the trial court to conduct an evidentiary hearing to determine "the reasonable relationship of the contract to Colorado, the substantial contacts of the parties with Colorado and consideration of California's fundamental policy with respect to usury."  Id. at 441.  In so doing, the court distinguished the posture there--a demurrer--from the posture in prior cases which decided the issue on summary judgment.  See id. at 440.

/ / /

/ / /

14

**United States District Court**

**For the Northern District of California**

Here, there is no dispute of fact that Petters is a Minnesota corporation and that the contract calls for payment in Minnesota. There are no issues of fact to be resolved at trial and therefore this issue may be resolved in this summary judgment motion in Petters' favor.

### c. Fraud and Duress

Tran claims that Smith fraudulently induced him to sign the promissory notes and guarantees, thereby rendering them invalid even as to Petters. According to Tran, Smith falsely told him that Petters conditioned its financing of the 2003 Coach transaction on *both* Smith and Tran signing the promissory notes and guarantees. In fact, Petters had required only that Smith and/or BLS sign the notes and guarantees. Tran also claims that Smith told him that the notes were "just a formality," and that Smith would assume responsibility for the underlying debt. Tran also states that he believed he was signing only one promissory note, and that Smith led him to believe that the second note he signed was a copy of the first. Although the fraud was allegedly perpetrated by Smith, Tran claims that it still expunges him of liability to Petters.

The parties agree that the Restatement provides the governing legal standard:

> If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction.

Restatement (Second) of Contracts, § 164(2).

Here, Petters did give value for the promissory notes by financing the 2003 Coach transaction. Further, there is nothing in the record to suggest that Petters had a reason to know of Smith's alleged fraud. Therefore, Tran's efforts to extinguish his liability against Petters on fraud and duress grounds fails. Notably, Tran has made a cross-claim for fraud against Smith, and so he is not without remedy for Smith's alleged wrongdoing.

### d. Unilateral Mistake

Tran next claims that he signed the notes and guarantee based on an understanding that Smith was going to "take care of" the payments and that he believed that they were "just

a formality." Further, he claims that when he signed the second promissory note for $968,000, he believed he was signing a copy of the first note and that his signature would create no new legal obligations. He argues these mistakes make the note and guarantee unenforceable.

Both parties again rely on the Restatement:

> Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and
>
> (a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or
> (b) the other party had reason to know of the mistake or his fault caused the mistake.

Restatement (Second) of Contracts § 153.

### (i) The $1.3 million Promissory Note

With respect to the $1.3 million note, Petters argues that Tran cannot invoke the defense of mistake because it is undisputed that Tran signed the note with knowledge that it was binding upon him. Petters also argues that Tran also bore the risk of mistake because he signed the notes knowing that he was ignorant as to all the details. See Restatement (Second) of Contracts § 154(b) (party bears risk of mistake where "he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient").

Both of these critiques have merit. First, even if Tran was mistaken that Smith would cover Tran's liability on the note, his signature still indicates that he accepted liability to Petters for the amount stated by the note. Second, even if Tran did believe that his signature of the notes was a mere formality, he assumed the risk that this was not true by signing a note which on its face was far more than a legally insignificant document. As such, Tran's mistake defense fails with respect to the first note.

/ / /

/ / /

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

(ii) The $968,000 Promissory Note

With regard to the $968,000 promissory note, Petters argues that Tran's account is inconsistent with the evidence and lacks credibility. These, however, are factual contentions that cannot be resolved at summary judgment.

Petters also argues that Tran bore the risk of the mistake. However, if Tran is credible in claiming that he signed the second note under the belief that it was a copy of the first note then he did not enter into that agreement knowing he was ignorant of key facts. As such, Tran's account creates a material dispute of fact that precludes summary judgment on the second note.

(iii) The guarantee

Tran signed one guarantee. It appears that he is arguing that he signed the guarantee under the same mistake that prompted him to sign the $968,000 promissory note. Summary judgment is therefore denied.

**B. Commission**

Petters also moves for summary judgment on BLS's counterclaim for breach of an alleged contract requiring Costco and Petters to pay BLS a 10% commission on the failed 2003 Coach transaction. However, Smith admitted in his deposition that a specific 10% figure was never discussed or contemplated. Instead Smith testified, and all other parties agree, that the understanding was that BLS would receive whatever profits were left over at the end of the transaction. All parties further agree that BLS would receive nothing if there were no profits remaining at the end of the transaction. Pursuant to this understanding, summary judgment should be granted on BLS's commission claim.

BLS argues that it is entitled to a commission under settled California[7] law which provides that a broker's right to a commission accrues when "the contract of sale is executed, or when opportunity to make such contract is given to the seller." Twogood v. Monnette,

---

[7]Costco argues that Washington law should apply because the purchase orders contain a choice-of-law clause. However, BLS's implied contract claim does not rely on contract rights arising out of the purchase orders, and therefore the choice-of-law clause contained therein is inapplicable.

1   191 Cal. 103, 107 (Cal. 1923).  This precedent, which discusses only the time of accrual,

2   does not apply because there was never any brokerage or commission contract among the

3   parties.  Cf. id. at 105 (referring to express commission contract between the parties).  Here,

4   it appears that there may have been an implied contract that BLS would be entitled to profits

5   on transaction, if there were any.  The parties contest whether this agreement was a

6   commission agreement or a profit agreement.  Regardless of what label should be assigned to

7   the contract, it is clear that BLS was only entitled to money from the transaction if there was

8   a profit left over at the end.  Because the Costco transaction was not profitable, the time that

9   BLS's right to collect accrued is immaterial.  BLS has no right to collect any money at all

10  from an unprofitable transaction.  As such, the motion for summary judgment on BLS's

11  commission claim is granted.

12  **III.  Cross-defendant Costco's Partial Motion for Summary Judgment Against Cross-Complaintants BLS and Barry Smith**

13          **A.  BLS's Right to a Commission**

14          As stated above, Costco's motion for summary judgment on BLS's crossclaim for a

15  10% commission should be granted.

16          **B.  BLS's Third-Party Beneficiary Rights**

17          Costco also argues for dismissal of BLS's theory that it can recover as a third-party

18  beneficiary of the purchase order agreements between Costco and Petters.  It is undisputed

19  that the purchase orders do not mention either a commission or BLS.  Instead, BLS argues

20  that the understanding of the parties that BLS would be paid the profits from the transaction

21  is enough to support a finding of third-party beneficiary rights.  Therefore the dispute is a

22  legal one over the question of whether third-party beneficiary rights may be proven absent

23  any clear manifestation of such rights on the face of the contract.

24          The parties dispute whether California or Washington law applies to this question.

25  The purchase orders are on their face "subject to all terms and conditions of the National

26  Distributors Vendor Agreement," which, in turn, states that all disputes will "be resolved

27  under Section 20 of the Costco Wholesale Standard Terms United States (2000)."  The

28  Standard Terms state that the agreements subject thereto are "governed by and construed

United States District Court

For the Northern District of California

18

1   according to the laws of the state of Washington."  Thus, the purchase orders incorporate by

2   reference the Washington choice-of-law clause.

3       BLS claims that Costco has waived invocation of the choice-of-law clause by failing

4   to argue choice of law before, and by citing only California law in its motion to dismiss.

5   However, courts have not found that this type of conduct to merit application of estoppel

6   absent something more, such as the estopped party having argued the specific issue of

7   choice-of-law or a showing of intentional delay.  See General Signal Corp. v. MCI

8   Telecomm. Corp., 66 F.3d 1500, 1505 (9th Cir. 1995) (declining to apply judicial estoppel).

9   BLS's further claim that the Vendor Agreement was not produced in discovery also falls

10  short because the document was, in fact, produced.

11      Under Washington law, "creation of a third-party beneficiary contract requires that the

12  parties intend that the promisor assume a direct obligation to the intended beneficiary at the

13  time they enter into the contract."  Del Guzzi Construction Co., Inc. v. Global Northwest

14  Ltd., 105 Wash.2d 878, 879 (Wash. 1986).  Further, "the contracting parties' intent is

15  determined by construing the terms of the contract as a whole, in light of the circumstances

16  under which it is made."  Schaaf v. Highfield, 127 Wash.2d 17, 22 n. 5 (Wash. 1995).

17  Costco is therefore correct that the contracts' failure to refer to BLS or a commission is fatal

18  to the third-party beneficiary claim.

19      **C. Indemnity**

20      BLS has also included a separate cause of action for indemnification of all damages

21  BLS is ordered to pay to Petters.  BLS states that Costco's wrongful conduct was the

22  proximate cause of Petters' damages.  Costco moves for summary judgment on this claim to

23  the extent it is based on any alleged breach of contract related to the Coach transaction.  As

24  shown above, BLS has no contract claim for a commission or as a third-party beneficiary for

25  the Coach transaction.  Thus, to the extent BLS seeks indemnity based on either of these

26  alleged contracts, that claim is dismissed.

27  / / /

28  / / /

**CONCLUSION**

For the reasons stated above, BLS's motion for summary judgment is GRANTED in part and DENIED in part; Petters' motion for summary judgment is GRANTED in part and DENIED in part; and Costco's motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

Dated: August 26, 2005

_____
CHARLES  R. BREYER
UNITED STATES DISTRICT JUDGE

United States District Court

For the Northern District of California